**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 11a0524n.06

**Nos. 08-3948, 08-4011**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| AMY KATHLEEN SMITH;<br>DEMETRIOUS YARDIF SMITH, | ) | |
| | ) | |
| | ) | |
| Plaintiffs-Appellants/ | ) | |
| Cross-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| ABN AMRO MORTGAGE GROUP | ) | UNITED STATES DISTRICT |
| INC. et al., | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendants-Appellees, | ) | |
| | ) | |
| CHASE MANHATTAN | ) | **OPINION** |
| MORTGAGE CORPORATION et al., | ) | |
| | ) | |
| Defendants-Appellees/ | ) | |
| Cross-Appellants. | ) | |
| | ) | |

**Before: MOORE and STRANCH, Circuit Judges; COHN, District Judge.***

**JANE B. STRANCH, Circuit Judge.** Demetrious and Amy Smith brought this action

alleging that they were the victims of a fraudulent real estate flipping scheme. As discovery

commenced, the district judge initiated and personally facilitated settlement discussions between the

parties. The district court concluded that those discussions produced a binding and enforceable oral

settlement agreement. On appeal, the Smiths contend that no binding and enforceable settlement

agreement was reached. They also challenge the district judge's failure to transfer the case or recuse

---

*The Honorable Avern Cohn, United States District Judge for the Eastern District of
Michigan, sitting by designation.

himself from considering the existence and enforceability of the agreement. For the following reasons, we **AFFIRM** the judgment of the district court.

## BACKGROUND

On January 26, 2006, Demetrious and Amy Smith filed this action in the United States District Court for the Southern District of Ohio. Initially proceeding *pro se*, the Smiths asserted a number of common-law and statutory claims against the defendants, a group of mortgage brokers, real estate appraisers, title companies, and lending agencies.[1] The Smiths allege that the defendants conspired to operate a fraudulent real estate flipping scheme, in which the Smiths were induced into purchasing three investment real estate properties at inflated prices based on fraudulent appraisals and loan documents. Jeffrey Henry, a mortgage broker for defendant NMF, allegedly brokered the transactions.[2] As a result of the scheme, the Smiths claim that they suffered substantial monetary losses and were forced to seek Chapter 13 bankruptcy protection. They also claim that all three of the properties became the subject of foreclosure actions. Given their financial condition, the district court allowed the Smiths to proceed *in forma pauperis* ("IFP") pursuant to 28 U.S.C. § 1915.

Defendants filed motions to dismiss the case. The magistrate judge recommended that the case be dismissed in its entirety, concluding that the Smiths were estopped from raising their claims

---

[1]The primary defendants in the case, and those represented on appeal, are Chase Home Finance LLC (successor to Chase Manhattan Mortgage Corporation) ("Chase"), Mid America Land Title Agency ("Mid America"), Mortgage Electronic Registration Systems, Inc. ("MERS"), National Mortgage Funding ("NMF"), and ABN AMRO Mortgage Group, Inc. ("ABN AMRO").

[2]Public records establish that, in 2005, Jeffrey Henry pled guilty to criminal charges relating to his role as the mortgage broker in a multi-million dollar mortgage flipping scheme in the Cincinnati area. *See United States v. Henry*, No. 1:05-CR-00073 (S.D. Ohio 2005).

because they failed to disclose the claims as an asset in their Chapter 13 bankruptcy proceeding. The district court, however, declined to accept the magistrate judge's estoppel recommendation. The court concluded that the Smiths' failure to disclose was merely inadvertent and therefore did not preclude the Smiths from bringing this lawsuit. The court did dismiss some of the Smiths' claims on other grounds. Soon thereafter, counsel entered an appearance for the Smiths and discovery proceeded on the remaining claims.

####   A.      The Settlement Conference

The district judge personally facilitated a day-long settlement conference on May 1, 2008. Although the record contains few details regarding the manner of the settlement discussions, the district judge acknowledged that he functioned as a mediator, talking to each side separately throughout the day and "go[ing] back and forth" between the parties to try to reach a settlement. JA1010.

At the end of the day, the district judge conducted a hearing on the record in his chambers. As the district judge explained, "I think we have reached a settlement in this case, and we're going to go around and just talk to everybody about it." JA655. The district judge then announced what he thought were "the basic settlement terms." JA656. The judge continued: "If anybody has any comments in terms of additions or deletions, we can discuss them. Then after we hammer all that out, we'll go around the table one more time to see if everybody agrees with what we have agreed to here." *Id.*

As summarized by the court, the settlement agreement awarded the Smiths specified sums of money from defendants NMF (Jeffrey Henry's former employer), Mid America, and MERS.

3

Defendant ABN AMRO, mortgagee for two of the properties at issue, assumed ownership of those properties, which were subject to foreclosure proceedings. In exchange, ABN AMRO forgave all possible deficiency claims it had against the Smiths. Defendant Chase forgave all but a specified portion of a deficiency judgment already pending against the Smiths arising from a foreclosure sale on the third property. As a result of the settlement, all claims of any kind between the parties would be released and the Smiths' appeal of the bankruptcy case would be dropped. After concluding his summary of the agreement, the district judge asked: "Did I say anything incorrectly or does anybody want to add anything that's germane or did I hit the key points?" JA658.

Counsel for several of the parties raised a handful of issues requiring clarification. After addressing those issues, the district court asked the parties if they had "anything else they want[ed] to add." JA665. When nobody responded, the court continued:

| | |
|---|---|
| COURT: | So let's start with the Smiths. You've heard everything I have discussed. Are you in agreement with that? |
| MS. SMITH: | Um, yes. Um, I got—if I wanted to write a book, could I change the names and just, you know, don't name anybody by name? |
| [DEF. COUNSEL]: | The answer would be no. |
| COURT: | The way the thing is set up now, probably not. |
| MR. SMITH: | I'm good with the terms. |
| THE COURT: | Mr. Smith is good with the terms. Mrs. Smith? |
| MS. SMITH: | Okay. |
| THE COURT: | Okay. Counsel? |

[PLS.' COUNSEL]:    If my clients are happy, I'm happy.

JA665–JA666.

Counsel for the defendants and the bankruptcy trustee indicated their agreement.  The court stated that it would "retain jurisdiction to enforce any terms of the settlement agreement" and asked counsel for defendant NMF to "take the first cut" at drafting the agreement and circulate it "so that it's ready to go in 30 days."  JA667.  The district judge scheduled a telephone status call for the following month "to find out if there are any problems," and concluded by stating his opinion that "[t]his is a good resolution of a thorny problem, and . . . we are all better off having it handled this way."  JA668–JA669.  The district court's docket entry for the hearing stated that the "matter has been resolved."  DE166.

B.        *Motions for Modification and Enforcement of Oral Settlement Agreement*

Less than two weeks after the settlement conference, the Smiths filed a "Request for Modification of the Settlement Agreement."  Attached to the request were two virtually identical affidavits, one from each of the Smiths, stating their intention to withdraw from the settlement agreement.  The affidavits acknowledged that the Smiths "made a settlement agreement on May 1, 2008," but claimed that they "can no longer agree to the terms of the settlement considering the damages [they] suffered," JA420, JA423.  The Smiths alleged that they entered into the agreement under financial duress and had not realized the true financial consequences of the agreement.  They requested ownership of the real estate properties at issue (or an equivalent value for the property that had already been sold in foreclosure), along with "fix-up money" allegedly promised by Jeffrey Henry as part of the flipping scheme.  JA421, JA424.

5

On June 2, the defendants responded with a motion to enforce the alleged settlement and a separate sealed motion for sanctions against the Smiths. The motion to enforce argued that the parties reached an enforceable settlement agreement in the presence of the district judge and on the record, and that the Smiths' alleged duress and change of heart were not valid bases to modify the terms of the agreement. The motion for sanctions requested the district court to exercise its inherent authority to sanction the Smiths' litigation conduct by awarding attorneys' fees, costs, and expenses incurred as a result of the Smiths' attempt to modify or set aside the settlement agreement.

While the motions to modify and enforce were pending before the district court, the Smiths filed a *pro se* motion for change of venue and recusal. The Smiths stated that they were "seeking a 'Change of Venue' in hopes of being able to have a fair and equitable trial," JA800, which they thought was necessary because "too much racial prejudice exists in the Southern District Court of Ohio," JA799. They sought recusal of the district judge because they claimed it was inappropriate for him to adjudicate the existence and enforceability of the settlement agreement that he helped facilitate. They also sought recusal based on the judge's purported racial bias, pointing to his alleged statement "that mediation was better than a jury trial because [the Smiths] may get a jury from rural counties," from which the Smiths "inferr[ed] that [the jury] would be prejudice[d] to an Afro-American." JA801.[3]

---

[3]The Smiths offer various summaries of the district judge's alleged statement. *See, e.g.*, Appellants' 1st Br. at 25 (claiming that the judge "persuaded [the Smiths] that they could not get a fair trial . . . because the population in the majority of counties . . . which constituted the jury pool . . . was white"); *id*. at 37 (the Smiths "did not want a jury trial because . . . the counties from which the jury pool would be drawn were largely white"); *id*. at 38 (district judge spoke of "the difficulty that the Smiths might have getting an essentially 'white' jury to be sympathetic to the Smiths'

On June 25, the court conducted a hearing on the Smiths' motion for change of venue or recusal. At the conclusion of the hearing, the district judge denied the motion without explanation. The following week, the court conducted a hearing on the existence and enforceability of the oral settlement agreement. At the hearing, the Smiths generally reiterated their arguments that they wanted the agreement modified or set aside because they did not enter into the agreement voluntarily and because it did not award them enough money. Mrs. Smith testified that her husband pressured her to agree to the settlement because of the trial judge's statements that "he couldn't get any more money" from the defendants, JA995, and "that [the] jury pool [would] probably be from citizens of Highland or Switzerland County, which are basically all-white counties," JA971. She also testified that she did not feel there was a binding agreement because "there were a lot of issues that hadn't been discussed during the Settlement Agreement." JA971. Mr. Smith agreed, testifying that he "felt coerced" and "pressured" to agree because the trial judge kept "saying '[w]ell, I can't get nothing else for you'" and "'[t]hey won't budge.'" JA1015–JA1016.

C.     *Final Opinion & Order*

The district court issued an Opinion and Order on July 15, granting the defendants' motion to enforce the settlement agreement and denying the Smiths' motion to modify it. Applying Ohio contract law, the district court concluded that the Smiths were bound by the terms of the oral settlement agreement reached at the May 1 conference. According to the court, "the Smiths were represented by competent counsel . . . prior to and during the entire settlement process," JA636, and

---

allegations"). At oral argument, counsel alleged for the first time that the district judge also referred to a possible jury as consisting of "white red necks."

"[a]fter review of the essential negotiated terms of agreement, all parties acknowledged their acceptance of the terms," JA637. Because "the Smiths knowingly, intentionally and voluntarily entered into the settlement agreement," the district court concluded that the Smiths were bound by its terms. JA639. The Opinion and Order incorporated by reference an accompanying Order, which set forth the terms of the May 1 agreement as understood by the district court. The district court also denied the defendants' motion for sanctions without explanation.

### D.        *Post-Judgment Matters*

On July 28, the Smiths filed a timely notice of appeal. Defendants (with the exception of ABN AMRO) timely cross-appealed from the denial of their motion for sanctions. On August 7, the defendants also filed in the district court a motion to revoke the Smiths' IFP status on appeal. They argued that the appeal was "manifestly frivolous," JA480, and not taken in good faith, JA487. The Smiths opposed. On December 11, the district court granted the motion to revoke the Smiths' IFP status, finding "no factual or legal basis for [an] appeal" because the Smiths "entered into the settlement agreement knowingly, intentionally, and voluntarily." JA628.

### ANALYSIS

### I.        EXISTENCE AND ENFORCEABILITY OF ORAL SETTLEMENT AGREEMENT

### A.        Standard of Review and Choice of Law

On appeal, the Smiths challenge the existence and enforceability of the oral settlement agreement. We review the district court's factual determination that the parties agreed to settlement for clear error. *Re/Max Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 645 (6th Cir. 2001). We review a district court's decision to enforce the agreement for an abuse of discretion. *Id.*; *Therma-Scan, Inc.*

8

*v. Thermoscan, Inc.*, 217 F.3d 414, 419 (6th Cir. 2000). Because settlement agreements are a type of contract, the formation and enforceability of a purported settlement agreement are governed by state contract law. *Bamerilease Capital Corp. v. Nearburg*, 958 F.2d 150, 152 (6th Cir. 1992). The pertinent events in this case occurred in Ohio, and the parties agree that Ohio contract law applies.

**B.      Existence of Settlement Agreement**

Under Ohio law, "a valid settlement agreement is a contract between parties, requiring a meeting of the minds as well as an offer and acceptance." *Rulli v. Fan Co.*, 683 N.E.2d 337, 338 (Ohio 1997) (syllabus). Although "[i]t is preferable that a settlement be memorialized in writing, . . . an oral settlement agreement may be enforceable if there is sufficient particularity to form a binding contract." *Kostelnik v. Helper*, 770 N.E.2d 58, 61 (Ohio 2002). "To constitute a valid settlement agreement, the terms of the agreement must be reasonably certain and clear." *Rulli*, 683 N.E.2d at 339.

*1.      Preliminary Negotiations*

The Smiths first argue that no enforceable settlement agreement was reached during the May 1 settlement discussions because the discussions were "merely a set of preliminary negotiations leading up to a written, binding contract." Appellants' 1st Br. at 24. In support, the Smiths point out that the district judge's initial oral summary of the settlement agreement was not exhaustive—counsel for both sides engaged in a give-and-take discussion with the judge on a variety of issues that were not contained in his initial summary. They also note that, at the hearing's conclusion, defense counsel agreed to prepare a draft agreement for circulation and execution.

The Smiths' claim is belied by the record in this case. Soon after going on the record at the May 1 conference, the district judge summarized the "basic settlement terms," which included specified monetary awards to the Smiths from NMF, Mid America, and MERS, minus a specified portion of a deficiency judgment for Chase. The judge also explained that all pending actions would be dismissed. The parties then discussed several additional issues requiring clarification. After the parties concluded their discussion, all of the parties, including the Smiths and their counsel, expressly assented to the terms as stated on the record. The terms of this agreement as set forth in the record of the district court are "reasonably certain and clear," *Rulli*, 683 N.E.2d at 339, and are therefore enforceable under Ohio law.[4]

After the parties assented to the agreement, all that remained was to sort out the "general recital-type things that are standard to settlement agreements" and to put the agreement in writing. JA662. As this Court explained in a similar case applying Ohio contract law, "[t]he existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement." *Re/Max Int'l, Inc.*, 271 F.3d at 646. For these reasons, the district court did not err in concluding that the parties reached an oral settlement agreement.

---

[4]The Smiths' claims to the contrary are further undermined by the fact that, in their motion to modify the agreement filed in the district court, they expressly acknowledged that they had "made a settlement agreement on May 1, 2008," but simply claimed that they could "no longer agree to the terms of the settlement." JA420, JA423.

2.    *Meeting of the Minds*

The Smiths also argue that there was no meeting of the minds because they were not aware that the agreement required ABN AMRO and Chase to forgive any deficiency claims they had against the Smiths. We are not persuaded. At the settlement conference the district court summarized the proposed agreement as providing for the compromise of Chase's deficiency claim on one property and the total forgiveness of any deficiency claims held by ABN AMRO on the other two properties. It also subsequently clarified at the conference that the two properties financed by ABN AMRO "would be conveyed to [ABN AMRO] in [their] entirety" in lieu of foreclosure and ABN AMRO would "releas[e] any and all claims o[f] deficiency or anything else [it] would have against [the Smiths]." JA658–JA659. As noted above, the Smiths and their counsel agreed to the terms of the agreement. Objectively, the parties reached a meeting of the minds.[5]

3.    *Defendants' Failure to Submit Evidence*

Reversal of the district court's decision is also required, the Smiths argue, because the defendants did not introduce any evidence to establish that the parties reached an agreement. Similarly, they contend that the defendants failed to introduce evidence demonstrating that the court-entered agreement contains the same terms as those actually agreed to by the parties during the May 1 conference. In support of their argument, they rely on *Powers v. MagiTech Corp.*, No. 2001-L-

---

[5]In a related argument, the Smiths argue that Chase's and ABN AMRO's waiver of their deficiency claims is insufficient consideration to support the agreement. The Smiths have not cited, and we have not found, any authority suggesting that the promise to forgo pursuit of the deficiency claims was insufficient consideration under Ohio law. *See, e.g.*, *Mathis v. St. Alexis Hosp.*, 650 N.E.2d 141, 144 (Ohio Ct. App. 1994) (explaining that a promise to forbear pursuit of a legal claim is generally sufficient consideration provided the promisor subjectively believes the claim is valid).

015, 2002 WL 445045 (Ohio Ct. App. Mar. 22, 2002), where the court reversed a trial court's grant of a motion to enforce a settlement agreement because there was no evidence in the record establishing that the movant's drafted agreement reflected the oral agreement reached between the parties.

Unlike *Powers*, the evidence of a binding oral settlement agreement in the present case is contained in the district court record, particularly in the transcript of the May 1 settlement conference. Consequently, the district court did not err by failing to require defendants to introduce additional evidence to establish the existence of an agreement. Moreover, the Smiths do not point to any material differences between the oral agreement reached at the May 1 hearing and the district court's Order memorializing the agreement.

For all of these reasons, the district court did not err in finding that the parties reached an oral settlement agreement.

## C. Enforceability of Settlement Agreement

Assuming that the parties reached an oral settlement agreement, the Smiths alternatively argue that the agreement should be modified or set aside on a number of other grounds.

### 1. *Undue Pressure From District Judge*

The Smiths contend that the agreement is unenforceable because they were subject to undue pressure during the settlement mediation process from the district judge. In support, the Smiths point to two statements allegedly establishing judicial coercion. First, they allege that the district judge told them "that they stood a better chance to get an award of money in a settlement agreement rather than in a jury trial because of the nature of the jury pool." Appellants' 1st Br. at 42. Second, they

12

claim that the district judge told them "that he [could] not get any more money from the Defendants." Appellants' 1st Br. at 42–43.

We agree with the Smiths that, "[a]lthough judges should encourage and aid early settlement, . . . they should not attempt to coerce that settlement." *In re NLO, Inc.*, 5 F.3d 154, 157 (6th Cir. 1993); *accord* Code of Conduct for United States Judges Cannon 3A(4) (Commentary) ("A judge may encourage and seek to facilitate settlement but should not act in a manner that coerces any party into surrendering the right to have the controversy resolved by the courts."). As the Seventh Circuit has explained, coercion generally "occurs when a judge threatens to penalize a party that refuses to settle." *Gevas v. Ghosh*, 566 F.3d 717, 719 (7th Cir. 2009). The alleged statements in the present case evidence no judicial threat, express or implied, that the Smiths should settle the case or suffer court-imposed repercussions. Nor has our independent review of the record uncovered any conduct resembling coercion. Accordingly, the settlement agreement is not unenforceable on this ground.[6]

### 2.    *Economic Duress*

Second, the Smiths argue that the settlement agreement is unenforceable because of economic duress. They contend that as a result of defendants' fraudulent actions, they were put in an economic situation in which they had no choice but agree to the terms of the agreement. As Appellees correctly point out, the Smiths have forfeited any right to have this argument considered

---

[6]At oral argument, counsel for the Smiths argued that the district judge's coercive statements and actions constituted fraud upon the court. Because this argument was neither raised in the court below nor in the Smiths' appellate briefs, we decline to consider it in the first instance. *See, e.g.*, *Precaj v. Holder*, 376 F. App'x 553, 563 (6th Cir. 2010).

on appeal by not raising it in their opening brief. *See, e.g.*, *Golden v. Comm'r*, 548 F.3d 487, 493 (6th Cir. 2008) (concluding that argument not raised in opening brief was forfeited).

Even assuming that the argument is preserved, it would nevertheless be insufficient to invalidate the agreement. Under Ohio law, "[a] person who claims to have been a victim of economic duress must show that he or she was subjected to a wrongful or unlawful act or threat, and that it deprived the victim of his unfettered will." *Blodgett v. Blodgett*, 551 N.E.2d 1249, 1251 (Ohio 1990) (internal quotation marks and alterations omitted). As one Ohio court noted, "courts have rejected the proposition that when one executes a settlement or satisfaction merely because one cannot afford to wait for the outcome of the dispute, the settlement or satisfaction may be subsequently avoided." *Wilkinson v. Cincinnati Ins. Co.*, No. CA99-10-181, 2000 WL 270044, at *3 (Ohio Ct. App. Mar. 13, 2000). In the present case, the Smiths cite no evidence that the defendants forced them into settling the dispute rather than continuing to pursue the legal action. As a result, the district court correctly rejected the Smiths' economic duress argument.

> 3. *Defendants' Failure to Circulate Drafted Agreement Within Thirty Days*

The Smiths argue that the settlement agreement is unenforceable because the defendants did not circulate the settlement draft within thirty days, as requested by the district court at the May 1 hearing. We disagree. The oral settlement agreement became binding at the time the parties reached the agreement during the May 1 hearing. There is no indication in the record that the effectiveness of the settlement agreement was contingent on the circulation of a writing within thirty days. The thirty-day period was a request from the district court so that the drafts would be "ready to go" upon termination of the bankruptcy case and before a telephone status conference scheduled for June 5.

The expectation that the memorialized agreement would be executed within thirty days was dashed by the Smiths' intervening motion to modify or set aside the agreement. Thus, the defendants' failure to circulate the proposed draft within thirty days does not excuse the Smiths from the agreement.

4.      *Statute of Frauds*

The Smiths argue that the oral settlement agreement is unenforceable because it violates Ohio's statute of frauds, Ohio Rev. Code § 1335.05, which generally requires transactions involving real estate to be reduced to writing. We decline to consider this issue because the Smiths did not raise it in their opening brief in this Court. *See Golden*, 548 F.3d at 493. We note, however, that the Smiths' argument would likely fail because Ohio law generally treats settlement agreements that are read into the record as outside the statute of frauds. *See, e.g.*, *Thomas v. Thomas*, 449 N.E.2d 478, 484 (Ohio Ct. App. 1982).

5.      *Conclusion*

The district court transcript of the May 1 settlement conference establishes that the parties reached a binding oral settlement agreement. The Smiths had the benefit of counsel both during and outside of the settlement discussions. "Where the parties enter into a settlement agreement in the presence of the court, such an agreement constitutes a binding contract. Neither a change of heart nor poor legal advice is a ground to set aside a settlement agreement." *Walther v. Walther*, 657 N.E.2d 332, 335 (Ohio Ct. App. 1995) (citation omitted). The district court's decision on the existence and enforceability of the oral settlement agreement is affirmed.

## II.  SMITHS' MOTION FOR A CHANGE OF VENUE OR RECUSAL

The Smiths also challenge the district court's denial of their motion for a change of venue or recusal.  They argue that the district court should have granted their motion for a change of venue pursuant to 28 U.S.C. § 1404(a) on the ground that the jury pool in the Southern District of Ohio is racially prejudiced.  They also contend that the trial judge erred by not recusing himself pursuant to 28 U.S.C. § 455, based primarily on his personal involvement as a mediator during the settlement discussions.  Defendants argue that the district judge correctly denied both motions.  Defendants also contest this Court's jurisdiction to consider these issues because the Smiths' notice of appeal does not specifically designate the district court's denials of the recusal and transfer motions.

### A.  Appellate Jurisdiction

This Court has jurisdiction over appeals from "final decisions of the district courts."  28 U.S.C. § 1291.  A district court decision generally is "final" for purposes of Section 1291 if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945); *accord In re Saffady*, 524 F.3d 799, 802 (6th Cir. 2008). The parties do not appear to dispute that the district court's Opinion and Order, along with the accompanying Order setting forth the terms of the binding settlement agreement, collectively constitute a final decision of the district court appealable under 28 U.S.C. § 1291.  The Opinion and Order conclusively resolved the litigation by compelling adherence to the terms of the settlement agreement set forth in the incorporated Order.

The parties dispute, however, whether the Smiths' notice of appeal referencing only these two contemporaneously entered orders is sufficient to confer jurisdiction on this Court to consider

16

the district court's earlier denial of the Smiths' motion for recusal or change of venue.[7] Defendants rely primarily on Federal Rule of Appellate Procedure 3(c)(1)(B), which requires a notice of appeal to "designate the judgment, order, or part thereof being appealed."

"It has long been the rule 'that an appeal of a final judgment draws into question all prior non-final rulings and orders.'" *Caudill v. Hollan*, 431 F.3d 900, 904 (6th Cir. 2005) (quoting *McLaurin v. Fischer*, 768 F.2d 98, 101 (6th Cir. 1985)). As this Court succinctly explained in *Caudill*, "our rule is that we will entertain arguments on all objections and asserted errors prior to the final disposition of a case if a party indicates in its notice of appeal that it appeals *either the final judgment or the final order in the case*." 431 F.3d at 906 (emphasis added) (concluding that a notice of appeal designating a final order was sufficient to give the Court jurisdiction to consider non-final ruling leading up to final order); *accord Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 553 (6th Cir. 2010) (unpublished) (same).

In the present case, the district court entered an Opinion and Order on July 15 that conclusively resolved the litigation by compelling adherence to the terms of the settlement agreement set forth in the accompanying Order. Although the Smiths' notice of appeal does not explicitly identify the district court's earlier non-final entry denying the motion for a change of venue or recusal, the notice of appeal specifically designates the simultaneously entered orders intended to function as the final decision of the district court. Such a notice of appeal is sufficient to bring up

---

[7] The Smiths' notice of appeal designated, in relevant part, "the Opinion and Order (Sealed Doc. 199), entered July 15, 2008" and the "accompanying Order (Sealed Doc. 200), entered contemporaneously with its Opinion and Order." JA38.

all non-final rulings upon which the court's final decision is predicated. *See Caudill*, 431 F.3d at 906. As a result, this Court has jurisdiction to consider the propriety of the district court's decision denying the Smiths' motion for change of venue or recusal.

### B. Standard of Review

This Court reviews the denial of a motion for a change of venue for abuse of discretion. *Zomba Enters., Inc. v. Panorama Records, Inc.*, 491 F.3d 574, 588 (6th Cir. 2007). A district judge's denial of a motion to recuse also is reviewed for abuse of discretion. *Johnson v. Mitchell*, 585 F.3d 923, 945 (6th Cir. 2009).

### C. Motion for Change of Venue

The Smiths argue that the district court should have granted their motion for a change of venue pursuant to 28 U.S.C. § 1404(a) because they "do not believe that as African American[s] they can get justice in the Southern District of Ohio." Appellants' 1st Br. at 36. Instead, "[t]he Smiths want[] to be in a district of Ohio where the racial mix [i]s fairer," Appellants' 3d Br. at 30, in hopes of having a more sympathetic jury, Appellants' 1st Br. at 36. They specifically suggest the Northern District of Ohio because that district "is more liberal in interpreting minority cases." *Id.*

Counsel for the defendants conceded at oral argument that the Smiths' status as plaintiffs did not preclude them from seeking a change of venue pursuant to 28 U.S.C. § 1404(a). As this Court explained in *Philip Carey Manufacturing Co. v. Taylor*, 286 F.2d 782 (6th Cir. 1961), "[t]he right to a transfer under [28 U.S.C. § 1404(a)] is available to a plaintiff as well as a defendant. A plaintiff is not bound by his choice of forums, if he later discovers that there are good reasons for transfer." *Id.* at 784; *accord* 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice*

18

& *Procedure* § 3844 (3d ed. 1989) (recognizing the "very substantial authority," including this Court's decision in *Taylor*, "for the proposition that [a] motion . . . may be made by the plaintiff").

Although the Smiths were not precluded from seeking a change in venue, the district court did not abuse its discretion in denying the Smiths' request. At the time the Smiths filed the request for a change of venue based on the alleged bias of the jury pool, the parties were disputing the existence and enforceability of the settlement agreement before the district judge. Consequently, at that time, there was no allegedly biased jury to avoid. Moreover, an unsubstantiated claim of jury bias, such as the one alleged here, is insufficient to compel a district court to transfer a case. The district court did not abuse its discretion in denying the Smiths' motion for a change of venue.

**D.     Motion for Recusal**

The Smiths also challenge the district judge's denial of their motion for recusal under 28 U.S.C. § 455. They argue recusal was required because the district judge (i) harbored racial bias and (ii) served as the judicial mediator of the settlement discussions that yielded the disputed settlement agreement.

*1.     Alleged Racial Bias of the District Judge*

In their opening brief, the Smiths argue that the district judge should have recused himself because "he is biased against African Americans." Appellants' 1st Br. at 37. In their reply brief and at oral argument, however, the Smiths appeared to abandon the argument. To the extent the argument is being asserted on appeal, its sole basis appears to be the district judge's alleged statement to the Smiths to the effect "that the Smiths did not want a jury trial because in

19

Southwestern Ohio the counties from which the jury pool would be drawn were largely white."

Appellants' 1st Br. at 37.[8]

We have exhaustively reviewed the district court record and find it totally devoid of any evidence that the district judge harbored racial bias or prejudice. The alleged statement, if made, obviously was designed to clarify that any jury empaneled in the Southern District of Ohio would be drawn from the entire district, not just the Cincinnati metropolitan area, and to share the judge's candid assessment of trial risks based on his judicial experience. In fact, counsel for the Smiths acknowledged in the district court that even she "did not realize that the District Court chose its pool from ten counties." JA1189. Particularly in the context of a private mediation conference, such a statement does not indicate that the district judge harbored any racial bias or prejudice.

2.      *Challenge to Serving as Judge and Mediator*

The Smiths also argue that the district judge should have recused himself from considering the motions on the existence and enforceability of the oral settlement agreement given the judge's personal participation in the settlement discussions that produced the agreement.

Several provisions of the primary federal recusal statute, 28 U.S.C. § 455, are potentially implicated by the Smiths' argument. Section 455(b) requires disqualification in certain situations, such as where the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding." 28 U.S.C. § 455(b)(1). Section 455(b)(5)(iv) requires a judge to recuse himself in those instances where the judge "know[s]" that

---

[8]As noted above, the specifics of the alleged statement vary throughout the record. *See supra* note 3 and accompanying text.

he is "likely to be a material witness in the proceeding." Section 455(a) also requires a district judge to "disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

We find it unnecessary to resolve the recusal question presented here, however, because recusal error, if any occurred, was harmless. *See Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 862 (1988) (noting that "there is surely room for harmless error" in the recusal context because "[t]here need not be a draconian remedy for every violation of § 455(a)"). Although we apply the harmless-error doctrine with great caution, we are convinced it applies in this case given the inescapable legal conclusion that the parties reached an enforceable oral settlement agreement. *See Morgan v. Money*, No. 99-3251, 210 F.3d 372, 2000 WL 178421, at *2 (6th Cir. 2000) (unpublished table decision) (holding that district judge's failure to recuse was harmless error where the underlying question was "patently clear" and so there was "no need to vacate the district court's decision and to remand to another district court judge to make the same clear determination"). Accordingly, we decline to determine whether the district judge abused his discretion by failing to recuse himself.

## III.    *IN FORMA PAUPERIS* STATUS ON APPEAL

Federal Rule of Appellate Procedure 24(a)(3) generally allows parties permitted to proceed *in forma pauperis* in the district court to proceed as such on appeal without further authorization, unless the district court "certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis." After the Smiths filed their notice of appeal from the district court's order compelling settlement, defendants moved the district court to revoke

the Smiths' IFP status on appeal. The district court granted that motion on December 11, 2008, certifying in a separate order that this appeal was meritless.

To the extent the Smiths continue to seek IFP status, that issue is not before the Court for at least two reasons. First, litigants denied IFP status on appeal by a district court generally must seek relief in the court of appeals by filing a motion pursuant to Federal Rule of Appellate Procedure 24(a)(5), rather than appealing from the district court's order. As we explained in *Callihan v. Schneider*, 178 F.3d 800 (6th Cir. 1999), "[o]nce the district court denies the pauper motion, the litigant can file a motion for pauper status with this court in accordance with [Rule 24(a)(5)]. Any appeal from an order denying pauper status on appeal will not be entertained and shall be dismissed sua sponte." *Id.* at 804; *accord* Fed. R. App. P. 24 (Advisory Committee Notes, 1967) (recognizing that "[t]he simple and expeditious motion procedure" set forth in Fed. R. App. P. 24(a)(5), "rather than an appeal from . . . the certification of lack of good faith, [is] the proper procedure for calling in question the correctness of the action of the district court"). Because the Smiths did not file a motion with this Court to proceed on appeal *in forma pauperis* in compliance with Rule 24(a)(5), the Smiths' IFP status is not properly before us.

Second, even assuming that the Smiths procedurally could appeal from the district court's revocation order, this Court lacks jurisdiction to consider the issue because the Smiths' notice of appeal did not designate the post-judgment order revoking the Smiths' IFP status. Unlike pre-judgment orders that merge into the district court's final judgment, post-judgment orders generally do not do so. The Court, therefore, does "not . . . entertain issues raised in post-judgment motions

22

if the notice of appeal states only that the appeal is from the final order or the final judgment."

*Caudill*, 431 F.3d at 906.

For these reasons, we are unable to consider the propriety of the district court's order revoking the Smiths' IFP status on appeal.

## IV.    DISTRICT COURT'S DENIAL OF SANCTIONS AGAINST THE SMITHS

Cross-Appellants challenge the district court's denial of their motion for sanctions against the Smiths seeking "attorneys fees, costs, and expenses incurred as a result of the egregious circumstances involving . . . Plaintiffs' failure to abide by the terms of the settlement." JA702. They argue that the district court erred by not imposing sanctions pursuant to its inherent authority to sanction litigation conduct, and particularly by not stating any reasons for its denial.

We review for abuse of discretion a district court's denial of sanctions. *Jones v. Ill. Cen. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010). Although a district court has inherent authority to sanction a party for litigation conduct, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991), such an award "*requires* a finding of bad faith or of conduct tantamount to bad faith," *BDT Prods., Inc. v. Lexmark Int'l, Inc.*, 602 F.3d 742, 752 (6th Cir. 2010) (internal quotation marks omitted). "[T]he mere fact that an action is without merit does not amount to bad faith. . . . [I]n order for a court to find bad faith sufficient for imposing sanctions under its inherent powers, the court must find *something more* than that a party knowingly pursued a meritless claim or action at any stage of the proceedings." *Id.* at 753 (internal quotation marks omitted).

As Cross-Appellants correctly point out, this Court has "held, particularly in the 'close' or serious sanction cases, that the district court should set out its 'analysis and discrete findings' with

respect to its decision on the allowance or rejection of sanctions." *Palmer v. Nationwide Mut. Ins. Co.*, 945 F.2d 1371, 1377 (6th Cir. 1991) (quoting *In re Ruben*, 825 F.2d 977, 991 (6th Cir. 1987)). Although the district court "was remiss in not providing some explanation for" denying sanctions, the issue of sanctions in this case "is not so close . . . that the district court's lack of explanation constitutes an abuse of discretion." *Moross Ltd. P'ship v. Fleckenstein Capital, Inc.*, 466 F.3d 508, 520 (6th Cir. 2006).

We agree that the Smiths' motion to modify or set aside the oral settlement agreement lacked legal merit, but we can find no evidence in the record that the Smiths proceeded in bad faith or engaged in conduct tantamount to bad faith. The only evidence cited by Cross-Appellants in support of their claim for sanctions is the Smiths' motion to modify or set aside the oral settlement agreement.[9] As noted above, the fact that the Smiths may have filed a meritless motion does not, without more, establish the bad faith required to impose sanctions on litigants in this context. *See BDT Prods.*, 602 F.3d at 753. And our review of the record convinces us that the Smiths genuinely believed that they were not bound by the oral settlement agreement and that the agreement's enforceability and terms should be determined by another judge. Accordingly, we conclude that the district court did not abuse its discretion by denying the motion for sanctions against the Smiths.

---

[9]Cross-Appellants try to support their claim for sanctions by pointing to the district court's revocation of the Smiths' IFP status. The district court's sanctions order, however, must be reviewed in light of the record that was before the district court at the time the order was issued. The fact that the district court subsequently revoked the Smiths' IFP status does not establish that the district court abused its discretion in denying sanctions five months earlier. Moreover, the exclusive basis of the district court's finding of bad faith in its revocation order was the meritless nature of the Smiths' claims on appeal, a finding that is insufficient to demonstrate the requisite bad faith for sanctions imposed pursuant to the court's inherent powers. *See BDT Prods.*, 602 F.3d at 753.

## V.     MOTIONS FOR SANCTIONS FOR CONDUCT DURING APPEAL

Shortly after oral argument was heard in this case, Appellees NMF, Chase, MERS, Mid America, and ABN AMRO filed a motion seeking sanctions against the Smiths' counsel for conduct during appeal pursuant to 28 U.S.C. § 1927. They allege counsel should be sanctioned for taking two actions. First, counsel notarized a *pro se* affidavit filed in this Court by her clients, after this Court had previously entered an order noting the impropriety of such filings and striking a similar *pro se* affidavit filed by her clients. Second, counsel erroneously filed in this Court (rather than the district court) a motion for relief from the district court's judgment pursuant to Federal Rule of Civil Procedure 60(b). In response, counsel for the Smiths claims that she did not realize the Smiths intended to make the *pro se* filing, and points out that she (on behalf of her clients) subsequently moved for its withdrawal, a request that this Court granted. She also claims that she was unaware that the Rule 60(b) motion would be improper if filed in this Court.

Section 1927 of Title 28 of the United States Code provides that an attorney "who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." "The purpose of § 1927 is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 644 (6th Cir. 2009) (internal quotation marks omitted). "[U]nlike sanctions imposed under a court's inherent authority, § 1927 sanctions require a showing of something less than subjective bad faith, but something more than negligence or incompetence." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006). Although our review of the record

suggests that counsel's well-intentioned zeal in representing her clients may have affected her judgment at times during this litigation, we believe that the challenged conduct during this appeal is not sufficiently "unreasonabl[e] and vexatious[]" to justify sanctions under § 1927.

Several months after filing their first sanctions motion, the same Appellees moved the Court for leave to file, under seal, another already-prepared motion for sanctions, this time pursuant to Federal Rule of Appellate Procedure 38. To the extent Appellees remain intent on filing their motion for sanctions pursuant to Rule 38, they may do so under seal within five days of the filing of this opinion. Opposition briefs to any motion would be due ten days thereafter, with no replies. We remind the parties, however, that the awarding of sanctions under Rule 38 "is a matter entrusted to our discretion," *Dubay v. Wells*, 506 F.3d 422, 432 (6th Cir. 2007), and we do not exercise that discretion simply because an appellant's argument "may indeed be quite weak," *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 308 (6th Cir. 2008).

## CONCLUSION

For the aforementioned reasons, we **AFFIRM** the judgment of the district court.